IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-169-FL

SHELVIE JEAN WEEKS,                        )
                                           )
            Plaintiff/Claimant,            )
                                           )
                                           )        **MEMORANDUM AND**
            v.                             )        **RECOMMENDATION**
                                           )
MICHAEL J. ASTRUE, Commissioner of         )
Social Security,                           )
                                           )
            Defendant.                     )

This matter is before the court on the parties' cross motions for judgment on the pleadings

[DE-16, DE-18] pursuant to Fed. R. Civ. P. 12(c). Claimant Shelvie Jean Weeks ("Claimant") filed

this action pursuant to 42 U.S.C. § 1383(c)(3) seeking judicial review of the denial of her application

for Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has

expired and the pending motions are ripe for adjudication  Having carefully reviewed the

administrative record and the motions and memoranda submitted by the parties, this court

recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's

Motion for Judgment on the Pleadings and remanding the case to the Commissioner for further

proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on 7 December 2007, alleging disability

beginning 4 April 2005. (R. 18). Her claim was denied initially and upon reconsideration. *Id.* A

hearing before the Administrative Law Judge ("ALJ") was held on 13 November 2009, at which

Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 944-

74). On 12 January 2010, the ALJ issued a decision denying Claimant's request for benefits. (R. 15-26). On 26 August 2010, the Appeals Council denied Claimant's request for review. (R. 11-14). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

2

in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920a(e)(2).

In this case, Claimant alleges the following errors by the ALJ: (1) improper evaluation of a treating physician's opinion; (2) failure to find Claimant's impairments met Listing 12.05C; (3) improper assessment of Claimant's credibility; and (4) improper assessment of Claimant's residual functional capacity ("RFC"). Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 1, 11, 15, 17.

3

## FACTUAL HISTORY

### I.    ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 20). Next, the ALJ determined Claimant had the following severe impairments: seizure disorder, borderline intellectual functioning, depression, headaches and obesity. *Id.* The ALJ also found Claimant had the following nonsevere impairments: hypertension, acid reflux, jaw pain and back pain. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in her activities of daily living, moderate difficulties in social functioning and in concentration, persistence and pace with no episodes of decompensation. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] requiring simple, routine and repetitive tasks in a low-stress environment with the following physical limitations: occasional climbing and balancing; no driving

---

[1]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time.  20 C.F.R. § 416.967(b).

an automobile; "should avoid even moderate exposure to hazards;" and occasional contact with the public. (R. 22). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 25). At step four, the ALJ found Claimant has no past relevant work. *Id.* Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. *Id.*

## II.   Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 42 years old and unemployed. (R. 949, 951). Claimant is a high school graduate but was enrolled in special education courses. (R. 950, 958). Claimant was last employed as a part-time school cafeteria worker and has never held a full-time job. (R. 950, 967).

Claimant explained numerous medical conditions support her disability claim and her inability to work full-time. These medical conditions include seizures, acid reflux, depression, anxiety, high blood pressure, headaches, memory difficulties and back, leg, knee and jaw pain. (R. 952-56, 960-61). Claimant began experiencing seizures in 2004 and testified that she suffers from two types – one causing her to "fall down, shake, chew" and the other causing her to fluctuate in and out of consciousness. (R. 952). While initially testifying that her seizure medications help "[a] little bit," Claimant subsequently testified to experiencing no improvement and then stated the medications make her feel worse. (R. 952-53, 964). Claimant cannot predict the onset of a seizure nor does she know how long a typical seizure lasts. (R. 953). Claimant testified that she takes Nexium on occasion for acid reflux, which has improved since she began watching her diet. (R. 953). Claimant takes Zoloft for depression, for which she was hospitalized in 2002; however,

5

Claimant testified to experiencing no improvement in her symptoms, which include feeling sad and crying often. (R. 953-54, 967). Claimant experiences headaches "mostly every other day" for which she takes Tylenol. (R. 954). With respect to her anxiety and high blood pressure, Claimant testified to experiencing the former "a little bit" and to taking no medication for the latter. (R. 954-55). Claimant testified to experiencing difficulty remembering tasks and medical appointments. (R. 956). Claimant experiences pain throughout her "whole body" but emphasized her headaches and back, leg, knee and jaw pain. (R. 955-56, 961). Claimant testified that medication side-effects include fatigue and drowsiness. (R. 957).

As a result of her impairments and symptoms, Claimant testified that she cannot sit more than 20 minutes, stand more than 15 to 20 minutes or lift more than 20 pounds. (R. 955-56). Claimant can perform simple math but experiences difficulty with reading comprehension. (R. 950). Claimant knows how to drive but does not drive because she was unable to pass the written examination. (R. 949-50). Later during the hearing, Claimant admitted to driving and having a car accident. (R. 959-60). Claimant typically spends her days watching television and she does not cook, shop or perform household chores. (R. 957). Claimant does not enjoy "be[ing] around a lot of people" but she visits her daughter's home twice a week and "sometimes" accompanies her daughter on shopping outings. (R. 957, 965).

### III. Vocational Expert's Testimony at the Administrative Hearing

James Ryan testified as a VE at the administrative hearing. (R. 968-73). The ALJ asked the VE whether jobs exist for a hypothetical individual of the same age and education of Claimant with no past work experience and the physical capacity to perform medium work involving simple, routine and repetitive tasks in a low-stress environment with low production standards and

6

occasional contact with the public that requires no more than occasional climbing and balancing, no driving and avoidance of moderate exposure to hazards. (R. 969). The VE testified that a result of the hazard restriction, jobs at the medium exertional level are precluded; however, the VE testified jobs would exist at the light and sedentary levels. *Id.* The VE provided the following representative positions: (1) finish inspector (DOT #741.687-010); (2) bench worker (DOT #700.680-010); (3) housekeeper (DOT #323.687-014). (R. 970). The VE testified further that these jobs could be performed if the hypothetical individual was limited to no climbing of ropes, ladders and scaffolds. *Id.* Upon questioning by Claimant's counsel, the VE testified that the representative positions would not be possible to perform if the hypothetical individual could not "tolerate the [] orientation period," required unscheduled breaks or "has an inability cognitively to perform unskilled tasks." (R. 970-72). The VE testified further, however, that difficulty relating to coworkers and supervisors would not preclude employment because the representative positions require limited supervision and discourage interaction with coworkers. (R. 971).

## DISCUSSION

## I. The ALJ did not err in evaluating the opinions of Claimant's treating physician.

Claimant contends the ALJ should have accorded controlling weight to the opinion of Daniel T. Poole, M.D., Claimant's neurologist. Pl.'s Mem. at 15. On two different occasions, Dr. Poole opined that Claimant was unable to work due to seizures attributed to epilepsy, for which he has treated Claimant since May 2003. (R. 750, 882).[2] In a letter dated 27 October 2008, Dr. Poole stated

---

[2]     The administrative transcript contains duplicative copies of numerous treatment records regarding Claimant's seizures. While the ALJ specifically provided citations to the exhibits supporting her summary of the medical records, Claimant's counsel relied primarily on the duplicates thereof. Nevertheless, the court has endeavored to match the exhibits cited by counsel with those cited by the ALJ. The records relied upon by the court appearing in duplicate (and sometimes in

7

"[a]t this time I would consider [Claimant] to have intractable epilepsy which has been refractory to multiple anticonvulsants. Consequently, I do not feel that the patient is able to work in any capacity and therefore should be placed on total [d]isability." (R. 25,750). In a treatment record dated 15 June 2009, Dr. Poole reiterated his opinion that Claimant "is completely unable to gain any meaningful employment and she should be considered for permanent disability." (R. 882). The ALJ acknowledged the length, frequency, nature and extent of Claimant's treatment relationship with Dr. Poole between 2003 and 2009 via multiple references to his treatment notes. (R. 23-24). However, the ALJ accorded "little weight" to Dr. Poole's opinion that Claimant is unable to engage in gainful employment because he had "not described the claimant's abilities and limitations for specific work-related activities and, therefore, the undersigned gives little weight to these statements." (R. 25).

The ALJ must generally give more weight to the opinion of a treating physician because that doctor is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d)(2). However though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive

triplicate) are as follows, with the copies thereof appearing in parentheticals: R. 750 (27); 766 (287); 772 (304); 773 (305); 774 (306); 775 (285); 776 (286, 777); 778 (284); 779 (301, 651); 780 (302, 656); 781 (303, 657); 822 (637); 824 (421); 835 (327); 837 (347); 880 (207); 882 (637).

8

contrary evidence") (citation omitted); *Wireman v. Barnhart*, No. 2:05-CV-46, 2006 U.S. Dist. LEXIS 62868, at *23, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (stating an ALJ "may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings"); 20 C.F.R. § 416.927(d)(3).

When the ALJ does not give the opinion of a treating physician controlling weight, the ALJ must weigh the opinion pursuant to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship between the physician and the claimant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record and (5) whether the physician is a specialist. 20 C.F.R. § 416.927(d)(2)-(6); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). Moreover, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." S.S.R. 96-2p, 1996 SSR LEXIS 9, at *12, 1996 WL 374188, at *5. Also, while statements concerning an individual's inability to work are reserved to the Commissioner, such statements must nevertheless be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. *See* 20 C.F.R. § 416.927(e)(1); S.S.R. 96-5p, 1996 SSR LEXIS 2, at *5, 1996 WL 374183, at *2 (explaining "our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner").

9

The SSA has recognized that due largely to recent medical advances, people suffering from epilepsy or seizure disorders can now obtain substantial relief. As a consequence, the fact that one suffers from seizures does not necessarily compel the conclusion that he or she is disabled.

> As a result of modern treatment which is widely available, only a small percentage of epileptics, who are under appropriate treatment, are precluded from engaging in substantial gainful activity (SGA). Situations where the seizures are not under good control are usually due to the individual's noncompliance with the prescribed treatment rather than the ineffectiveness of the treatment itself. Noncompliance is usually manifested by failure to continue ongoing medical care and to take medication at the prescribed dosage and frequency. Determination of blood levels of anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken.

Soc. Sec. Ruling ("S.S.R.") 87-6, 1987 SSR LEXIS 17, at *3, 1987 WL 109184 at * 1.[3] Thus, in cases such as this, to demonstrate disability, a claimant must do more than merely show that she suffers from a seizure disorder. Instead, a claimant must show that the seizures are either so poorly controlled (despite compliance with a prescribed treatment regimen) or are of such frequency and/or severity, that they preclude her from engaging in any substantial gainful work which exists in the national economy. *See, e.g., Banks v. Sec'y of Health & Human Servs.*, No. 92-56084, 1994 U.S. App. LEXIS 2341, at *7, 1994 WL 1082 at *3 (9th Cir. Feb. 3, 1994)("[T]he ALJ's finding of no disability is supported by substantial evidence. While it is undisputed that [claimant] suffers from a seizure disorder that is not entirely controlled with medication, the medical and vocational evidence of record establishes that this condition was not so severe as to preclude her from performing the modest requirements of the light and sedentary jobs identified by the vocational expert as appropriate for an individual with her limitations.").

---

[3]     Although S.S.R. 87-6 specifically addresses when a seizure disorder meets Listing 11.02 or 11.03, the concepts stated in that ruling appear to be applicable to the instant matter as well.

In summarizing the record, the ALJ discussed Claimant's treatment notes regarding her seizures at length. Dr. Poole has treated Claimant since May 2003 for a seizure disorder resulting from headaches, which take the form of either shaking, jerking and tongue biting accompanied by postictal confusion and memory loss or "petit mal type seizures accompanied by staring." (R. 23, 754, 770, 778, 781, 822, 826, 835, 837, 846, 848). Treatment records from May and July 2003 indicate Claimant was experiencing "abrupt episodes of" loss of consciousness approximately every two weeks lasting anywhere from 20 to 30 minutes. (R. 23, 769-70). Between May 2003 and May 2004 , Claimant underwent (1) CT scans of the head and MRIs of the brain, none of which revealed any pathology that would explain the seizures (R. 773, 761-62, 758-59, 769), (2) an EEG which was negative for seizure activity (R. 23, 769, 880), and (3) a video EEG performed by Kevan E. Van Landingham, M.D., with Duke University Medical Center, which did not reveal any seizure activity and lead to Dr. Van Landingham's finding that Claimant had a psychogenic seizure disorder. (R. 23, 222, 778). Treatment records dated 2003 through 2004 from Dr. Poole and the Emergency Department of Wayne Memorial Hospital ("WMH") indicate Claimant complained of frequent nocturnal and daytime seizures. (R. 23, 766,774-76, 778, 840, 842, 846, 848). After visiting Dr. Poole on 17 January 2005, Claimant did not visit him again until 16 March 2006, when she complained of seizures "almost every day." (R. 773-74). Similarly, Claimant only sought treatment for her seizures from WMH on two occasions in 2005. (R. 835, 837). Records from 2006 through 2008 also indicate a decline in Claimant's treatment for her seizures. While some records during this time period indicate Claimant reported relief from seizures for many months, *see, e.g.*, (R. 781) (noting that following Claimant's seizure on 29 July 2006, Claimant was seizure free until 15 January 2007); (R. 780) (19 March 2007 treatment record stating Claimant "may have had a seizure a couple

11

of weeks ago" with her last known seizure occurring 15 January 2007), other records indicate Claimant complained of frequent seizures, *see, e.g.*, (R. 824) (12 March 2006 record noting Claimant reported having "twelve to fifteen seizures per year"); (R. 822) (15 January 2007 treatment record indicating Claimant reported "15 or more seizures per year"); (R. 779) (9 August 2007 treatment record noting Claimant experiences "periodic seizures about 2-3 x per week associated with loss of consciousness); (R. 753-54) (21 October 2008 treatment record noting Claimant reported having generalized tonic clonic seizures "just about every 2 weeks"); (R. 756) (30 December 2008 treatment record noting Claimant reported having seizures "about every month or so). Following the suspected March 2007 seizure,[4] documented seizures do not appear in the record until 21 July 2008, 21 October 2008 and 30 December 2008. (R. 24, 753, 756, 780, 818). In a 15 June 2009 treatment record, the most recent progress report, Dr. Poole noted Claimant's seizures had been "fairly well" controlled with medication, averaging 1 to 3 seizures a month, until Claimant's medication "was inadvertently changed" to a generic brand. (R. 24, 882). As a result of this medication change, it was noted that Claimant "has had a significant increase in seizure activity." (R. 24, 882). With respect to medication compliance, the ALJ noted that Claimant "had not always been compliant with her anti-convulsant treatment regimen because she stated the medications were overly sedating." (R. 23); *see* (R. 769, 772-73, 775, 779, 781, 840) (treatment records indicating Claimant also complained of headaches, dizziness and nausea as a result of her seizure medication)[5]; *see* S.S.R. 96-7p, 1996 SSR

---

[4]    The ALJ noted that an EKG was performed on 7 March 2007, which was "unremarkable." (R. 24, 820)

[5]    Claimant's counsel contends that memory loss was a side effect of Claimant's seizure medications. *See* Pl.'s Mem. at 17 (citing treatment records dated 10 October 2003 and 17 December 2003). However, it is evident from these treatment records the memory loss complained of in October 2003 was attributed to Claimant taking her medication improperly due to a

12

LEXIS 4, at *23, 1996 WL 374186, at *8 (explaining acceptable reasons for medication noncompliance include the inability to tolerate side effects associated therewith). Upon summarizing the medical records from Dr. Poole and WMH, the ALJ acknowledged also the March 2008 opinion of Rudolph Maier, M.D., a state agency examining consultant, that Claimant's seizure disorders might prevent her from performing gainful employment. (R. 23, 686).

Defendant points out additional treatment records, cited by the ALJ, indicating Claimant was simply not taking her medication properly. *See* Def.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Def.'s Mem.") at 15-16;[6] (R. 778) (17 November 2004 treatment record indicating Claimant was taking seizure medication three times a day instead of twice a day as instructed); (R. 826) (21 January 2006 treatment record noting Claimant's boyfriend did not think Claimant was taking her seizure medication );[7] (R. 818) (21 July 2006 treatment record indicating Claimant had failed to take her seizure medication the evening prior and that day, resulting in two documented seizures). The court observes, however, that the majority of records indicate medication compliance despite the side effects. *See e.g.*, (R. 769, 772, 775, 779, 780-81, 882). Also, a review of the treatment records indicate Claimant continued to experience seizures despite medication compliance. *See e.g.*, (R.

---

misunderstanding while the December 2003 complaint of memory loss was specifically attributed to Claimant's depression for which she was prescribed Zoloft. (R. 766, 768). The court notes however that in a treatment record dated 16 March 2006, Dr. Poole noted Claimant had complained of memory loss as a side effect of her medication. (R. 773).

[6]     The ALJ noted also that "past blood tests have revealed [Claimant's] blood levels of medication have often been below therapeutic levels." Defendant relies on this statement in support of its argument that Claimant failed to take her medications properly on several occasions. *See* Def.'s Mem. at 15. Neither the ALJ nor Defendant provides citations supporting this statement and the court can find none.

[7]     Defendant erroneously states this medical record is dated April 2004. *See* Def.'s Mem. at 15.

779) (9 August 2007 treatment record from Dr. Poole noting Claimant believed her medications, Keppra and Zonegran, were helping but continued to experience seizures "about 2-3 x per week");(R. 753-54) (21 October 2008 WMH record noting Claimant took Keppra for seizures yet reported having generalized tonic clonic seizures "just about every 2 weeks"); (R. 756) (30 December 2008 WMH record noting Claimant reported having seizures "about every month or so" and was taking Keppra and followed by Dr. Poole); (R. 882) (15 June 2009 treatment record from Dr. Poole noting Claimant was doing "fairly well" on Keppra, "averaging 1-3 seizures per month").

As an initial matter, the court notes the ultimate question of disability rests fully within the purview of the ALJ. 20 C.F.R. § 404.1526(e); 404.1527(e)(2). Thus, despite the recommendation of a treating physician, the ALJ may find a that a claimant is not under a disability. It appears both parties agree that Claimant has a documented history of seizures. However, the timing of Claimant's seizures and how Claimant's functional abilities are impacted subsequent to her seizures are not altogether clear. While treatment records from 2008 and 2009 indicate approximately 1 to 3 seizures per month, these records provide no information as to whether the seizures are occurring during work hours or at night. Moreover, the medical records provide no information as to the functional limitations imposed by Claimant's seizures, beyond stating at times that Claimant experiences a loss of consciousness for up to 30 minutes. While the ALJ's explanation for discounting Dr. Poole's opinion is terse and arguably could have been more detailed, the summary of the medical records and the lack of information as to the impact of Claimant's seizures on her functional abilities, as noted by the ALJ, leads the court to conclude that Claimant has not carried her burden of showing that her seizures were so frequent to render her disabled. Accordingly, Claimant's argument as to this issue is without merit.

14

II.     **The ALJ's finding that Claimant's impairment did not meet or equal Listing 12.05 is not supported by substantial evidence.**

Claimant argues that the ALJ erred by finding that her impairment does not meet or equal Listing 12.05, the listing for mental retardation. Pl.'s Mem. at 17.

Claimant bears the burden of demonstrating that her impairments meet or equal a listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). Listing 12.05 sets forth a two-part inquiry for determining whether a claimant meets the requirements for mental retardation. *Shoulars v. Astrue*, 671 F. Supp. 2d 801, 813 (E.D.N.C. 2009) (citing *Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 U.S. Dist. LEXIS 92635, at *5, 2008 WL 4911794, at *3 (E.D.N.C. Nov. 14, 2008)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. First, a claimant must satisfy the diagnostic description of mental retardation, which requires a showing of "(1) significantly subaverage general intellectual functioning[8] (2) with deficits in adaptive functioning[9] (3) initially manifested during the developmental period; i.e. . . . before age 22." *Shoulars*, 671 F. Supp. 2d at 814 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05). Upon making this showing, the claimant must then meet the required severity level of this disorder, which

---

[8]     The phrase "significantly subaverage general intellectual functioning" appears also in the definition of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), which the DSM-IV defines as "an IQ of about 70 or below." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 39 (4th ed. 1994).

[9]     Listing 12.05 does not define "adaptive functioning." Regulations promulgated by the SSA provide that "[t]he definition of [mental retardation] . . . in [the] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). Given "the SSA declined to adopt any one of [these] specific definitions, . . . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, *inter alia*, deficits in adaptive functioning as defined by any of the [leading] professional organizations." *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008).

is accomplished by satisfying any one of four categories labeled (A)-(D) under § 12.05. *Id.*
Claimant contends that she satisfies the mental retardation listing under category C ("Listing
12.05C"), which requires (1) a valid verbal, performance or full scale IQ of 60 through 70; and (2)
another impairment, physical or mental, that imposes an additional and significant work-related
limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. In concluding Claimant did not
meet listing 12.05C, the ALJ's analysis was limited to the following:

> [C]laimant does not have a valid verbal, performance or full scale IQ of 60 through
> 70 and a physical or other mental impairment imposing an additional and significant
> work-related limitation of function. The record reveals the claimant has been able
> to raise her family independently and perform work activity on a sustained basis.

(R. 22).

1.     Severity Level

Before discussing whether Claimant satisfied step one of the mental retardation listing
analysis, the court is compelled to address the ALJ's "severity level" determination and in particular,
the IQ finding, which is contradicted by the record. As the ALJ acknowledged in discussing the
category "B" criteria, Claimant's "IQ scores range from 66-80." (R. 22). In particular, Claimant
scored a verbal intelligence quotient ("IQ") of 66, performance IQ of 80 and a full scale IQ of 70 on
the Wechsler Adult Intelligence Scale ("WAIS-III") test, administered on 18 April 2003 by state
agency examining consultant Teresa A. Poole, Ph.D. (R. 22, 161). Dr. Poole did not question the
accuracy of the scores. "In cases where more than one IQ is customarily derived from the test
administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series,
we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
12.00D(6)(c); *see also Rainey v. Heckler*, 770 F.2d 408, 410 (4th Cir. 1985). Claimant's lowest score

on the WAIS was a verbal IQ of 66, which falls within the sixty to seventy range required under §

12.05C.[10] (R. 161). Thus, contrary to the ALJ's finding, Claimant has the required IQ score for

Listing 12.05C. Moreover, the ALJ determined that Claimant suffered from multiple severe

impairments. (R. 20); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (explaining the "work-related

limitation of function" requirement is satisfied when the claimant is determined to have a severe

impairment at step two of the evaluation process) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *see*

*also Luckey v. Dept. of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989) (explaining the

second prong of Listing 12.05C is established by a finding that a claimant suffers from a "severe

combination of impairments"). Accordingly, the ALJ's finding that Claimant did not meet the

severity requirements of Listing 12.05C is not supported by substantial evidence.

2.    Deficits in Adaptive Functioning

While Claimant satisfies the Listing 12.05C criteria, she must satisfy also the diagnostic

description of mental retardation. *See Smith v. Barnhart*, No. 6:04-CV-34, 2005 U.S. Dist. LEXIS

5975, at *10, 2005 WL 823751, at *4 (W.D. Va. Apr. 8, 2005) (explaining "mental retardation is a

life-long, and not acquired, disability[;] [t]hus, to qualify as disabled under this listing, a [claimant]

must first demonstrate that he has had deficits in adaptive functioning that began during childhood");

*Justice v. Barnhart*, 431 F. Supp. 2d 617, 619 (W.D. Va. 2006) ("[E]ven if the record clearly

establishes that [a claimant] meets the [severity] requirements of [Listing 12.05C], a finding of

---

[10]       While this score was recorded after the developmental period, a person's IQ is presumed to
remain stable over time "in the absence of any evidence of a change in a claimant's intellectual
functioning." *Luckey*, 890 F.2d at 669; *see also Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir.
1985) (stating "there may be many reasons why an individual would not have had the opportunity
or need to have a formal intelligence quotient test until later in life" and concluding "[t]he fact that
one was not earlier taken does not preclude a finding of earlier retardation").

mental retardation cannot be warranted without a finding that [claimant] manifested deficits in adaptive functioning before age 22.") (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)). Under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), to be deemed mentally retarded one must have "significant limitations in adaptive functioning in <u>at least two</u> of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (emphasis added) (citing AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)).

Claimant contends her deficits in adaptive functioning began in her formative years, arguing in particular deficiencies in the areas of (1) functional academic skills, (2) work and (3) social/interpersonal skills. With respect to the area of functional academic skills, Claimant relies on her enrollment in special education classes,[11] her testimony that she required a reading[12] and math tutor in high school, suffered from a learning disability and was exempted from end-of-course testing due to reading difficulties, and Dr. Teresa Poole's test results revealing "intellectual functioning in the borderline range" and verbal skills "falling in the mildly mentally handicapped range." Pl.'s Mem. at 18; (R. 162, 958-59). Such evidence suggests Claimant demonstrated deficits in adaptive functioning prior to age 22 in the area of academic skills. *See e.g., Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (struggling in special education classes, having trouble with reading, writing

---

[11]     According to a letter dated 9 January 2008 from Angel Batts, the Exceptional Children's Department Chairperson for Goldsboro High School, exceptional children's records for students born before 1981 were destroyed; thus, the record contains no school transcripts for Claimant. (R. 602).

[12]     In support of her reading difficulties, Claimant relies on testimony that she was unable to get her driver's license due to her inability to pass the written examination. Pl.'s Mem. at 18; (R.959).

18

and math, and dropping out of school in the ninth grade constituted evidence of mental retardation prior to age 22). With respect to the area of work, Claimant testified she has never held a full-time job and in her brief, argues that she has never "performed any sort of skilled employment." Pl.'s Mem. at 18; (R. 950). Regarding her social/interpersonal skills, Claimant points to her testimony that she no longer has any hobbies or activities of interest (R. 957-58), the May 2004 video EEG record noting a diagnosis of "social phobia" (R. 226) and a psychological evaluation performed by state agency examining consultant Ashley T. Weeks, M.A., (R. 682) indicating Claimant "would likely have some difficulty relating well to fellow workers and supervisors . . . [and] tolerating the stress associated with day to day work activity" Pl.'s Mem. at 19.

The ALJ did not specifically address the diagnostic element of the mental retardation analysis. Rather, the extent of the ALJ's discussion with respect to adaptive functioning is limited to noting that Claimant "has been able to raise her family independently and perform work activity on a sustained basis." However, the "the fact an individual is able to work . . . and raise a family is not inconsistent with mild mental retardation." *Radford v. Astrue*, No. 5:08-CV-421-FL, 2009 U.S. Dist. LEXIS 131383, at *20, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009). Defendant argues "little evidence" exists outside of Claimant's enrollment in special education classes that Claimant suffered from deficits in adaptive functioning, arguing in particular, that most of Claimant's contentions regarding her alleged adaptive deficits are based on Claimant's testimony which the ALJ did not find fully credible. Def.'s Mem. at 25. Despite Defendant's explanation as to why Claimant has not met her burden in demonstrating that she suffers from adaptive deficits in at least two skill areas, this court must "judge the propriety of the [ALJ's determination] solely by the grounds invoked by the [ALJ]." *Shoulars*, 671 F. Supp. 2d at 818 (quoting *SEC v. Chenery Corp.* 332 U.S. 194, 196

19

(1947) (noting a court may not substitute its own reasoning for that of the agency)).

With the exception of Claimant's education history, it is unclear whether Claimant suffered from other adaptive deficiencies prior to age twenty-two. Nonetheless, this court cannot conclude that the ALJ's opinion is supported by substantial evidence. The ALJ determined incorrectly that Claimant did not satisfy the severity criteria of Listing 12.05C and failed to properly articulate his findings as to whether Claimant has deficits in adaptive functioning initially manifested prior to age 22. At the very least, the ALJ should have discussed Claimant's enrollment in special education. While the ALJ acknowledged it in the RFC discussion, the court is unable to determine whether the ALJ considered it as part of her determination as to whether Claimant had deficits in adaptive functioning initially manifesting before age 22. *See Brooks v. Astrue*, No. 2:10-CV-37-D, 2011 U.S. Dist. LEXIS 100383, at *21-*22, n.4, 2011 WL 3882283, at *7 n.4 (E.D.N.C. Aug. 17, 2011), adopted by 2011 U.S. Dist. LEXIS 100380, 2011 WL 3904104 (E.D.N.C., Sept. 2, 2011) (noting claimant's "history of poor performance in special education likely constitutes a limitation in the skill area of functional academic skills which, in combination with another limitation, could satisfy the diagnostic definition"). Accordingly, the court believes the matter should be remanded so that the ALJ can perform the required analysis pursuant to Listing 12.05. Because the court recommends remanding based on this issue, it does not address Claimant's additional arguments.

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-16] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-18] be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

20

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 23rd day of May, 2012.

Robert B. Jones, Jr.
United States Magistrate Judge

21